READING INTERNATIONAL, INC.;
Citadel Cinemas, Inc.; and Sutton
Hill Capital, LLC, Plaintiffs,

v.

OAKTREE CAPITAL MANAGEMENT
LLC; Onex Corporation; Regal Entertainment Group; United Artists Theatre Company; United Artists Theatre Circuit, Inc.; Loews Cineplex Entertainment Corporation; Columbia Pictures Industries, Inc.; The Walt Disney Company; Universal Studios, Inc.; Paramount Pictures Corporation; Metro–Goldwyn–Mayer Distribution Company; Fox Entertainment Group, Inc.; Dreamworks LLC; Stephen Kaplan; and Bruce Karsh, Defendants.

No. 03 CV. 1895(GEL).

United States District Court,
S.D. New York.

Dec. 10, 2003.

Glenn D. Pomerantz, Andrew C. Finch, Munger, Tolles & Olson LLP, Los Angeles, CA; Cyrus Amir–Mokri, Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York, for defendants Oaktree Capital Management, Stephen Kaplan and Bruce Karsh.

David S. Copeland, Kaye Scholer LLP, New York, New York (Fredric W. Yerman, Karin E. Garvey, Mark S. Popofsky, on the brief); Matthew P. Previn, Wilmer, Cutler & Pickering, New York, New York (A. Douglas Melamed, IJay Palansky, Jeffrey D. Ayer, Yaa A. Apori, Washington, DC, on the brief) for defendants Onex Corporation, Regal Entertainment Group, United Artists Theatre Circuit, Inc., and Loews Cineplex Entertainment Corp.

Kenneth R. Logan, Olivier N. Farache, Simpson, Thacher & Bartlett New York, New York (Sanford Litvack, Joanna Swomley, Quinn Emanuel Urquhart Oliver & Hedges, LLP, New York, New York; William E. McDaniels, John E. Schmidtlein, Williams & Connolly LLP, Washington, DC, on the brief) for distributor defendants.[1]

R. Hewitt Pate, Assistant Attorney General, Deborah P Majoras, Deputy Assistant Attorney General, (Catherine G. O'Sullivan, Steven J. Mintz, Ralph T. Giordano, on the brief), U.S. Department of Justice, Antitrust Division for the United States as amicus curiae.

## OPINION AND ORDER

LYNCH, District Judge.

Plaintiff Reading International, Inc. ("Reading"), its subsidiary, Citadel Cinemas, Inc. ("Citadel"), and Sutton Hill Capital, LLC ("Sutton Hill") (collectively, "plaintiffs" or "the Village East"), respec-

Stephen M. Axinn, Axinn, Veltrop & Harkrider LLP, New York, New York (Lauren S. Albert, Michael L. Keeley, on the brief) for the plaintiffs.

1. Plaintiffs name the following distributors as defendants in this action: Columbia Pictures, Walt Disney, Universal Studios, Paramount Pictures, Metro–Goldwyn–Mayer, Fox Entertainment Group, and Dreamworks.

tively the owner, operator, and landlord of the Village East Cinema in Manhattan, bring this complaint under federal and New York State antitrust laws against the operators and principal investors of the Loews and Regal theater chains, as well as most of the major film distributors. Plaintiffs allege that these parties conspired through various illegal means to restrain trade in the market for top commercial films in lower Manhattan. Plaintiffs seek relief under sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, and under sections 7 and 8 of the Clayton Act, 15 U.S.C. §§ 17 and 18. They also assert ancillary claims under New York statutory law for conspiracy in restraint of trade and under common law for unjust enrichment and tortious interference with prospective contractual relations. Defendants now move pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss plaintiffs' complaint for failure to state a claim. For the reasons discussed below, defendants' motion will be granted in part and denied in part.

## BACKGROUND

The following facts are taken from the complaint, except where noted. All factual allegations in the complaint are assumed to be true for purposes of this motion.

Plaintiff Village East owns and operates the Village East Cinema, an independent seven-screen movie theater located in lower Manhattan. Plaintiff Sutton Hill is the landlord of this property. Defendants Loews Cineplex Entertainment Group ("Loews") and Regal Entertainment Group ("Regal") respectively own the Loews Village Sevenplex and the United Artists Union Square Stadium 14 ("Union Square 14"), which are the nearest local theaters in competition with plaintiffs. Defendants Oaktree Capital Management and Onex

Corporation ("Oaktree" and "Onex") are investors in Loews and Regal.

During the 1990s, the movie exhibition industry underwent a period of expansion, followed by financial hardship, reorganization, and consolidation. The entities that are now known as Loews and Regal, in prior incarnations, exemplified this trend, each making numerous acquisitions before going bankrupt in 2000 and 2001. (Compl.¶ 72.) At this time, defendants Oaktree and Onex, two asset management companies that specialize in obtaining the assets of bankrupt corporations, acquired the claims of Loews' creditors, with Onex acquiring 60% and Oaktree acquiring 40%. (Compl.¶ 73.) Oaktree and Anschutz Investment Company ("Anschutz"), a similar investment firm which is not a party to this action, similarly bought the entire equity of what was then known as Regal along with two other failing exhibitors (United Artists and Edwards Theaters), and reorganized these three theaters as wholly-owned subsidiaries of the new Regal Entertainment Group (defendant Regal). (Compl.¶ 70.) Oaktree currently owns approximately 17% of Regal, with Anschutz owning 77%. (Compl.¶ 75.) At the time the Complaint was filed, Loews owned approximately 1,534 screens in the United States and Regal and its subsidiaries owned 5,711 screens. (Compl.¶¶ 63, 70.)

Plaintiffs claim that Loews and Regal have monopolized the market for what plaintiffs call "top commercial films" ("TCFs").[2] Specifically, they allege that past acquisitions of other theater chains on a national scale by Regal and Loews, and later, by Oaktree and Onex, have injured competition in lower Manhattan. They assert that past mergers have resulted in a monopsony in the "Lower Manhattan

---

**2.** In an impressive display of compound words, plaintiffs define TCFs as "newly-re- leased first-run industry-anticipated top-grossing commercial films." (Compl.¶ 2.)

Zone" that has allowed Regal and Loews to pressure distributors, also defendants in this action,[3] to enter exclusive and unreasonable licensing agreements for the distribution of TCFs, and ultimately, to close plaintiffs out of the market.

Plaintiffs further allege that Oaktree has attempted to control both Regal and Loews, competitors in the market. This has been accomplished, according to plaintiffs, not only through the acquisition of shares, but also through an illegal "interlock" whereby Oaktree "serves on the board of Directors of both Regal and Loews," that is, Oaktree's President Bruce Karsh serves on the board of Loews and Oaktree's principal Stephen Kaplan serves on the board of Regal.[4] (Compl.¶¶ 78, 119.) Since Oaktree and Onex together are sole shareholders of Loews, this interlocking directorate has enabled Onex and Oaktree jointly to control both companies, and to orchestrate the illegal agreements with distributors.

Plaintiffs assert that distributor defendants "refuse[ ] *even to receive* or consider offers from Reading to license Top Commercial Films to the Village East, which raises an inference of conspiratorial anticompetitive conduct" (Compl. ¶ 82A (emphasis in original)) and that they consistently grant Regal or Loews "clearances," which are exclusive rights to run films, that are unreasonable in length and serve no pro-competitive purpose. (Compl.¶ 82B.) They further complain that "move over" arrangements allowing Regal and Loews to move a film from a large screen to a smaller screen in a multiplex after the initial run grants defendants "exclusive rights to films until their value as first-run features is fully exhausted." (Compl.¶ 82C.)

The result of these actions has been to squeeze the independent Village East out of competition for the TCFs it needs to keep its box-office sales up and its customers coming back. According to the complaint, in the year 2002, Regal and Loews exhibited 29 of the 30 TCFs shown in the Lower Manhattan Zone, while the Village East did not show a single one. (Compl.¶ 3.) Although it has 25% of the screens and 22% of the total seats in the Lower Manhattan Zone, Village East only grossed 11% of the total revenue from films shown in 2002. (Compl.¶ 52–54.) Since 1999, the Village East has experienced a steady decline in attendance, box office receipts, and net income. Attendance in 2002 declined 59% below 1998 levels, and total revenues fell by 60% over the same period. (Compl.¶ 81.) In addition, plaintiffs allege that defendants' actions have resulted in consumer injury, including loss of competition, decrease in the number and variety of films exhibited, higher box-office prices, elimination of discounts, higher concession prices, and insufficient seats to meet consumer demand. (Compl.¶ 91.) Plaintiffs contend that these conditions, if allowed to continue, will soon drive the Village East out of business, "giving Loews, Regal, Onex and Oaktree complete control of the Lower Manhattan Zone." (Compl.¶¶ 81, 91.)

Defendants characterize plaintiffs' injuries as the result of "an aging seven-screen theater's inability to compete with a newer, larger, state-of-the-art megaplex, whose opening ... had the exact effect that the antitrust laws are designed to encourage." (Distr.Br. 2.) Defendants' theory is that plaintiffs have simply failed to remain competitive in a changing marketplace, in which Regal and Loews provide a more attractive venue for both con-

---

**3.** For a list of the distributors named as defendants, *see supra* note 1.

**4.** Kaplan and Karsh are also named as defendants in this action.

sumers and distributors in the exhibition of TCFs. They now move to dismiss, raising numerous defenses, discussed in turn below.

## DISCUSSION

■ On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court must accept "as true the facts alleged in the complaint," *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697, 699–700 (2d Cir.1994), and may grant the motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Thomas v. City of New York*, 143 F.3d 31, 36–37 (2d Cir.1998) (citations omitted); *see also Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir.1996) (stating that when adjudicating a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims" (internal quotation marks and citations omitted)). When deciding such a motion, the Court may consider documents attached to the complaint as exhibits or incorporated in it by reference, and such facts as are suitable for judicial notice pursuant to Fed. R.Evid. 201. *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir.1991). All reasonable inferences are to be drawn in the plaintiffs' favor, which often makes it "difficult to resolve [certain questions] as a matter of law." *In re Independent Energy Holdings PLC Sec. Litig.*, 154 F.Supp.2d 741, 748 (S.D.N.Y.2001). Furthermore, it should be emphasized that no special pleading requirements attach in antitrust cases, beyond those specifically set out by Congress; antitrust plaintiffs thus enjoy the same general standard for stating a claim as other litigants. *See Radovich v. National Football League*, 352 U.S. 445, 453–54, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); *Nagler v. Admiral Corporation*, 248 F.2d 319, 323–24 (2d Cir.1957).

### I. *Clayton Act § 7*

■ Plaintiffs bring their first through fourth claims for relief under section 7 of the Clayton Act, 15 U.S.C. § 18. Section 7 provides in relevant part that "[n]o person engaged in commerce ... shall acquire, directly or indirectly, the whole or any part of the stock or other share capital ... [or] the whole or any part of the assets of another person engaged also in commerce ... [where] the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." As the Supreme Court has noted,

> Section 7 is designed ... to arrest in their incipiency restraints or monopolies in a relevant market which, as a reasonable probability, appear at the time of suit likely to result from the acquisition by one corporation of all or any part of the stock of any other corporation. The section is violated whether or not actual restraints or monopolies, or the substantial lessening of competition, have occurred or are intended.

*U.S. v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 589, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). Section 7 is thus designed to reach potential as well as actual violations brought about through the excessive concentration of market power.

Plaintiffs' section 7 claims involve mergers by Loews and Regal and their investors, Onex and Oaktree, dating back to as early as 1988. (Compl.¶ 62.) Plaintiffs challenge four separate acquisitions by Loews, twelve by Regal and its various affiliates, and five by Onex and Oaktree, the latter of which took place as recently as 2001 and 2002. (Compl.¶ 76.) Plaintiffs assert that the market power amassed through these mergers has allowed defendant exhibitors and Onex and Oaktree to "pressure" distributors into granting exclusive licenses to Regal and Loews for the exhibition of TCFs. As the plaintiffs claim,

"[d]istributors fear licensing [TCFs] to the Village East against Loews' [and Regal's] wishes because of the potential consequences of being denied access" to exhibitor defendants' screens. (Compl.¶¶ 64, 71.) Plaintiffs seek treble damages, injunctions against further acquisitions, and divestiture of theaters already acquired by Regal and Loews, and of Oaktree's interest in Loews. (Compl. 39.) Defendants raise two defenses: (1) that plaintiffs lack antitrust standing to challenge these mergers, and (2) that plaintiffs have failed to define the relevant markets in which the mergers occurred. The Court need not reach the second issue because plaintiffs lack antitrust standing.

 Although the antitrust laws were intended as tools to prevent the concentration of market power and protect competition, they are not available to every injured plaintiff. *See Associated General Contractors of California v. California State Council of Carpenters, Inc.,* 459 U.S. 519, 537, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). As the Supreme Court has explained, "[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Id.* at 535 n. 31, 103 S.Ct. 897. In determining whether antitrust standing exists, the Second Circuit employs a two-pronged test. "As a necessary first step, courts must determine whether the plaintiff suffered an antitrust injury. If the answer to that question is yes, they must then determine whether any of the other factors, largely relating to the directness and identifiability of the plaintiff's injury, prevent the plaintiff from being an efficient enforcer of the antitrust laws." *Balaklaw v. Lovell,* 14 F.3d 793, 798 (2d Cir.1994). Under this analysis, plaintiffs' section 7 claims must fail.

### A. *Antitrust Injury*

[6, 7] The notion of "antitrust injury" grew from the recognition that a competitor may be injured not only by prohibited anticompetitive activity, but also by competition itself, and that antitrust laws were not intended to afford the latter injuries a remedy. *See Balaklaw,* 14 F.3d at 801. Antitrust injury, then, simply means "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). A threshold step in determining whether antitrust injury exists in section 7 claims is defining the relevant geographic and product markets in which the alleged anticompetitive effects occurs. This is "because the threatened monopoly must be one which will substantially lessen competition within the area of effective competition." *du Pont,* 353 U.S. at 593, 77 S.Ct. 872 (internal quotations omitted).

According to defendants, the first problem with plaintiffs' complaint is that plaintiffs are neither competitors nor customers in the market assertedly monopolized through the acquisitions in question. Plaintiffs have defined their relevant geographic market as the "Lower Manhattan Zone" (Compl.¶¶ 44–45), which encompasses the area south of Eighteenth Street in Manhattan "from river to river, excluding Battery Park City" (Compl.¶ 3), and their relevant product market as "top commercial films." (Compl.¶ 46.) However, none of the challenged mergers occurred inside the relevant geographic product market. Rather, plaintiffs allege that acquisitions *outside* of that market allowed defendant exhibitors to amass market power and misuse it in the Lower Manhattan Zone to pressure distributors into entering illegal clearance agreements. (Compl.¶¶ 5, 7, 64–

66, 71–72, 77, 78, 83.) As plaintiffs describe their theory, it "is not based on the elimination of competition between two acquired theaters in any given market, but on the ability conveyed by the many, many acquisitions to wield market power in market after market to require the Distributor Defendants not to deal with independent theaters such as Plaintiffs' Village East in the [Lower Manhattan Zone]." (P. Opp.Br. 51.)

■■■■ In their opposition brief, plaintiffs assert that it is not the location of the acquired asset that matters, but the market where the injury occurs: in other words, standing may exist "although the harm did not occur in the same market as the acquisition." (P. Opp.Br. 51–52.) This may be so; however, plaintiffs cite no analogous case, and this Court is aware of none, that has recognized antitrust standing where the defendant's horizontal acquisitions took place in a geographic product market in which the plaintiff was not a consumer or an actual or potential competitor. Rather, the consensus of the cases interpreting *du Pont* is that in order to

have standing, a plaintiff must be a participant in some capacity in the market in which the merger occurs. *See, e.g., United States v. Marine Bancorporation Inc.*, 418 U.S. 602, 622, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974) (holding that "the relevant geographic market or appropriate section of the country is the area in which the acquired firm is an actual competitor."); *Transamerica Corp. v. Board of Governors of Federal Reserve System*, 206 F.2d 163 (3d Cir.1953) (dismissing section 7 suit to block acquisition of commercial banks in five-state area when there was no finding that the five states constituted a single area of effective competition among the banks); *New Grant-Patten Milk Co. v. Happy Valley Farms, Inc.*, 222 F.Supp. 319, 320 (E.D.Tenn.1963) (dismissing section 7 claim challenging the defendant's acquisition of non-competing businesses "located and conducting business wholly outside the plaintiff's relevant market area"). The relevant inquiry, therefore, is not whether dominance in one geographic market could be used to create pressure in another, which it very well might, but whether the plaintiff was a market participant (or potential entrant) in *both* geographic areas for the relevant product.[5]

5. *du Pont*, 353 U.S. at 595–96, 77 S.Ct. 872, cited by plaintiffs, does not contradict this view: there, the relevant geographic market was defined as the national product market for automotive finishes and fabrics, in which plaintiff was a participant. *See also R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 103–04 (2d Cir.1989) (national product market for tea). Similarly, in *Blue Shield of Virginia v. McCready*, the Supreme Court held that although the plaintiff, a consumer of psychotherapy services, was not a competitor in the health insurance market, she was clearly a consumer in the relevant market, and was therefore "within that area of the economy endangered by that breakdown of competitive conditions" resulting from defendant's conduct. 457 U.S. 465, 480–81, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) (internal quotations omitted). Although *McCready* undoubtedly broadened the Court's approach to standing cases in terms of the allowable market role of the plaintiff, it did not alter the Court's prior

holdings as to the relevant geographic market. *See Marine Bancorporation*, 418 U.S. at 622, 94 S.Ct. 2856 ("[T]he relevant geographic market or appropriate section of the country is the area in which the acquired firm is an actual competitor.").

Other cases cited by plaintiffs in which parties have been afforded standing involved vertical mergers in which the acquisition itself threatened to deprive the plaintiff of an input plaintiff needed in the relevant geographic product market. *See Six West Retail Acquisition, Inc. v. Sony Theatre Management Corp.*, 2000 WL 264295, at *22–*24 (S.D.N.Y. Mar.9, 2000); *Yankees Entertainment Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F.Supp.2d 657 (S.D.N.Y.2002), or involved mergers where plaintiff was an imminent entrant into the relevant geographic product market, *see McCaw Pers. Communications, Inc. v. Pacific Telesis Group*, 645 F.Supp. 1166, 1170 (N.D.Cal.1986).

Plaintiffs have not alleged that they intend to attempt entry into any of the markets where the challenged mergers occurred, and have defined the relevant geographic market as encompassing only the Lower Manhattan Zone. The other locations in which the challenged mergers occurred, although not specifically defined in the complaint as "geographic markets," include approximately eighteen states from coast to coast and at least two foreign countries. The designated locations include areas with diverse population size and geographic scope, from cities to states to entire regions, and even entire countries.[6] Such a broad cause of action might be difficult to sustain even if plaintiffs had any connection with these markets. Having no such connection, plaintiffs' claim to antitrust injury is, at the very least, a significant reach.

The cases cited by plaintiffs, primarily *Tasty Baking v. Ralston Purina*, 653 F.Supp. 1250 (E.D.Pa.1987), do not compel a different result. In *Tasty Baking*, commercial bakers challenged a horizontal merger between two competitors that would effect various markets in the Northeast: Philadelphia, where the plaintiffs were dominant competitors, and Boston, New York, Washington, D.C., New England, and the mid-Atlantic region, where defendants were dominant. *Id.* at 1262. However, in *Tasty Baking*, the relevant geographic market was defined as *including* all of these areas. As the court explained:

> [Plaintiffs] claim that defendants' monopolization illegally will impair Tasty's ability *to enter new markets and develop business*, by facilitating [defendant's] negotiations with retailers for better store shelf space and promotional time slots in markets where Tasty does compete and by removing [defendants'] most substantial competitor in various markets and therein allowing Continental to reap monopoly profits that can subsidize predatory pricing in other markets.

(emphasis added). In each of the defined areas, plaintiff was either a market participant or a potential entrant, which is not so in the instant action.

Plaintiffs contend that requiring that plaintiff be a participant in the market where the merger occurred would preclude antitrust challenge to the mergers: "if no person injured by those effects would have standing, and nobody in the markets where the acquisitions occurred would have standing because they were not injured by the acquisitions, by Defendants' logic, *no* private party would have standing. Such a result is absurd." (P. Opp. Br. 50; emphasis in original). The argument is somewhat overstated. First, it is hardly "absurd" to require that someone in the class of persons that would have standing if injured actually *be* injured in order for a suit to proceed. Second, although there might not be any competitors in the markets where the mergers occurred, consumers in those markets who had been harmed by the aggregation of market power described by plaintiffs would have standing to bring a section 7 suit. *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 480–81, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). Finally, and most

---

**6.** The regions in which the mergers took place include Washington D.C., Chicago, Florida, Louisiana, Mississippi, Texas, Alabama, South Carolina, North Carolina, Georgia, Missouri, Wisconsin, Oklahoma, Virginia, Arkansas, New Jersey, Pennsylvania, the Pacific Northwest, and Nevada (Compl.¶¶ 62, 67, 68); countries listed include the United States, Canada, and even South Korea (Compl.¶ 62). Defendants argue that these markets are not sufficiently defined in the complaint for purposes of pleading a violation of section 7. (Exhib.Br. 12–16.) Because plaintiffs lack antitrust standing, the question of the sufficiency of plaintiffs' pleadings in this respect need not be reached.

importantly, as the following discussion indicates, a more direct remedy would exist for any further violations of the antitrust laws that occur in new markets as an indirect result of the challenged mergers, as is allegedly the case here. *See infra* Parts II–III.

Plaintiffs' theory does, however, raise one concern that is more difficult to dismiss off-hand: the problem they identify could apply in any number of industries in which mega-chains use power amassed through acquisitions in numerous small markets, where no competitors exist, to squeeze out competitors in other geographic areas. In such a case, assuming that no further antitrust violations occurred, as they allegedly have here, injured competitors in remote markets might well be left without any form of redress.[7] A bright-line rule that would under *no* circumstances recognize antitrust injury in such a situation might well be problematic.

Nonetheless, the Court need not resolve whether or not this rule is indeed absolute, or even whether it bars plaintiffs' claims here, because other factors, most prominently the remoteness of plaintiffs' injuries, militate against a finding of antitrust standing for the plaintiffs.

### B. *Remoteness of Injury*

 Even if it were conceded that plaintiffs' harms constituted antitrust injury, plaintiffs' claim would fail under the test for antitrust standing outlined in *Associated General Contractors*, 459 U.S. at 540–41, 103 S.Ct. 897, and adopted by the Second Circuit in *Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 724 F.2d 290

(2d Cir.1983). Once it has been determined that a plaintiff has suffered antitrust injury, the court must still determine whether other factors render the injury too indirect or remote for a plaintiff to be an "efficient enforcer" of the antitrust laws. *See Balaklaw*, 14 F.3d at 798. In analyzing this question, courts examine four factors: (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries. *Volvo North America Corp. v. Men's Intern. Professional Tennis Council*, 857 F.2d 55, 66 (2d Cir.1988); *Crimpers Promotions*, 724 F.2d at 296–97.

Plaintiffs' claims here fail under the first factor for two reasons. First, the mergers plaintiffs seek to challenge are not only geographically dispersed, but also span a time period stretching back over fifteen years. Second, the injuries plaintiffs assert are the result not of the mergers themselves, but of subsequent illegal agreements and actions commenced many years later. Such injuries are simply too remote in both time and causation to confer antitrust standing on plaintiffs.

In interpreting section 7, courts have emphasized two primary concerns: the importance of tying the analysis closely to the relevant product market, and the usefulness of section 7 as a preventative tool. The cases uniformly suggest section 7 was enacted in order to nip antitrust violations

---

**7.** Admittedly, of the cases cited above, none except *Tasty Baking* addressed precisely such a scenario. *See* 653 F.Supp. 1250. And, as plaintiffs urge, *Tasty Baking* arguably could be read more broadly to apply section 7 liability to situations where a competitor removes competition in one market to reap monopoly profits in another, unrelated market. However, to the extent that it may be read to stand for this proposition, the Court declines to apply its reasoning to the instant case for the reasons outlined in Part I–B, below.

in the bud, and to reach potential anticompetitive conduct that was not covered under the Sherman Act. *See, e.g., Brown Shoe Co. v. United States,* 370 U.S. 294, 318 n. 32, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). As the Supreme Court has explained,

> Section 7 of the Clayton Act was intended to arrest the anticompetitive effects of market power in their incipiency. The core question is whether a merger may substantially lessen competition, and necessarily requires a prediction of the merger's impact on competition, present and future. The section can deal only with probabilities, not with certainties. And there is certainly no requirement that the anticompetitive power manifest itself in anticompetitive action before § 7 can be called into play. If the enforcement of § 7 turned on the existence of actual anticompetitive practices, the congressional policy of thwarting such practices in their incipiency would be frustrated.

*F.T.C. v. Procter & Gamble Co.,* 386 U.S. 568, 577, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967) (citations omitted). *See also Brunswick Corp.,* 429 U.S. at 485, 97 S.Ct. 690 (describing Clayton Act as "a prophylactic measure, intended primarily to arrest apprehended consequences of intercorporate relationships before those relationships could work their evil").

The emphasis on section 7's promise as a forward-looking tool does not mean that it may not be used to challenge the anticompetitive effects of acquisitions that have already occurred. This is reflected in the remedies available under the Clayton Act, which include both injunctions against potentially anticompetitive mergers, and divestiture to cure violations once an acquisition has been consummated. *See* Clayton Act section 16, 15 U.S.C. § 26; *du Pont,* 366 U.S. at 333–34, 81 S.Ct. 1243. The Supreme Court has recognized that section 7 may even be used to remedy present anticompetitive effects of acquisitions that occurred in the distant past, holding that the statute of limitations begins to run not at the time of the acquisition itself, but when the injury occurs. *Zenith Radio Corp. v. Hazeltine Research. Inc.,* 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). As the Court explained:

> In the context of a continuing conspiracy to violate the antitrust laws, such as the conspiracy in the instant case, this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act.

*Id.; see also Berkey Photo. Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 295 (2d Cir.1979) (applying *Zenith's* holding).

Nonetheless, in applying this rule, courts have recognized that section 7 may not be the most effective way to reach anticompetitive harms that can be traced back to distant acquisitions. For example, in *International Railways of Central America v. United Brands Co.,* 405 F.Supp. 884 (S.D.N.Y.1975), this Court refused to apply section 7 to a merger dating back over 20 years, explaining that "[t]he difficulty [in applying the Clayton Act to acquisitions in the distant past] is that Section 7 speaks principally to the future." *Id.* at 899.

This difficulty is especially apparent where, as here, the danger presented by the merger has already allegedly ripened into a violation covered by another section of the antitrust laws. Ultimately, the plaintiffs' theory hinges not on the acquisitions themselves, but on the way defendants acted years after they occurred. *See Return on Investment Sys. v. Translogic Corp.,* 702 F.Supp. 677, 680 (N.D.Ill. 1988) ("[I]t was not the acquisition, but the

use of the power derived from that acquisition in a particular manner, which injured [plaintiff]. Plaintiff does have standing to challenge the use of that power ... but does not have standing to challenge the acquisition itself."). The harm alleged here, "the foreclosure of the Village East from obtaining practically any TCFs" (P. Opp.Br. 56), results far more directly from the allegedly unlawful exclusive agreements between exhibitor and distributor defendants, from the attempted monopolization by Oaktree, and from the illegal interlock between Loews and Regal than it does from acquisitions in distant markets many years ago. This weighs heavily against a finding of antitrust standing.[8]

The three additional factors outlined in *Associated General Contractors* do not rescue plaintiffs' claims. Certainly, as plaintiffs point out, the harm they have suffered is far from speculative, as it has allegedly already occurred. Although the claim that plaintiffs may have to close their theater altogether remains to be proven, it is not an entirely speculative result given the sharp drop in revenues alleged. However, as to "more efficient enforcers," it seems likely that if one or more of the challenged mergers had severe anti-competitive effects, either competing theater owners or consumers in the directly effected markets would have been motivated to take action. Plaintiffs in effect maintain that a single theater operator in one limited market that is not directly affected by *any* of these mergers is the most efficient party to enforce the antitrust laws against at least twenty different mergers effected at very different times over a fifteen-year period, whose direct impact was felt in markets many of which are a continent, or

even half a world, away. Their theory is essentially that at some unspecified point in the series, the overall market power of the chains reached a tipping point that arguably created sufficient power for them, at least in combination with each other, to exert unfair influence at the expense of competitors in geographic places not directly effected by any of the mergers themselves. Determining, in hindsight, where in the series of mergers this market power became excessive, particularly against a background of constantly shifting market conditions including the overexpansion and eventual bankruptcy of the chains, promises to be an unwieldy and speculative enterprise. Given the complex facts and indirect chain of causation alleged by plaintiffs, it is hardly likely that their complaint presents the most efficient way to apply antitrust scrutiny to these transactions which have apparently gone uncontested by those in a position to be most directly affected. As for the risk of duplicative recovery, this inquiry overlaps significantly with the question of potential enforcement and thus also raises significant problems for plaintiffs.

In sum, the significant doubt as to the existence of antitrust injury, the remoteness of plaintiffs' injury, the probable existence of more efficient enforcers and the concomitant potential for duplicative recovery, together argue strongly against a finding of antitrust standing for plaintiffs on their section 7 claim. Allowing plaintiffs to pursue a remedy for these acquisitions would entail sprawling and costly litigation. Should they achieve the relief they seek, the impact would be felt far beyond the market in which they compete. It is difficult to imagine that Congress

---

8. In considering the question of antitrust standing, the Supreme Court has likened the analysis to that of proximate cause. *See Illinois Brick,* 431 U.S. at 761, 97 S.Ct. 2061; *Crimpers Promotions,* 724 F.2d at 294. Such an analysis is consistent with the finding here that plaintiffs' injuries are simply too remote in "the chain of causation" to confer standing. *See Associated General Contractors,* 459 U.S. at 540, 103 S.Ct. 897.

intended the Clayton Act to be used by private plaintiffs as such a blunt instrument. Accordingly, the motion to dismiss plaintiffs' first through fourth claims to relief will be granted.

## II. *Sherman Act § 1*

 Plaintiffs next seek relief under section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States." They allege that Oaktree and Onex have entered into unlawful agreements "to jointly control separate competing exhibitors," that Regal and Loews and the distributor defendants have entered unlawful exclusive agreements, and that Regal has entered unlawful clearance agreements in restraint of competition. Defendants argue in response that plaintiffs have been injured by competition itself, rather than by any illegal anticompetitive activity, and that they therefore lack antitrust standing. Onex and the exhibitors further argue that plaintiffs have failed to plead sufficiently the alleged conspiracy between Oaktree's President, Kaplan, and its principal, Karsh, and that because neither Onex nor Oaktree has numerical control of Regal, "there can be no 'joint control.'" (Distr.Br. 17.) However, accepting plaintiffs' allegations as true, they have adequately stated a claim against defendants under section 1 of the Sherman Act.

### A. *Antitrust Injury*

 Under section 1 of the Sherman Act, a plaintiff must prove a contract, combination or conspiracy in restraint of trade. 15 U.S.C. § 1. Recognizing that certain types of restraint may have a procompetitive justification and effect, the antitrust laws provide redress only for "unreasonable" restraints. *Elecs. Communications Corp. v. Toshiba America Consumer*

*Prods. Inc.*, 129 F.3d 240, 243 (2d Cir. 1997). The burden on plaintiff to show anticompetitive harm thus differs depending on the type of conspiracy alleged. Price-fixing, certain group boycotts, and horizontal restraints, or agreements between competitors occupying the same level of distribution, are generally presumed to have anticompetitive effect on the market and are thus considered *per se* illegal, while vertical restraints, or agreements between firms at different levels of distribution, are subject to a "rule of reason" analysis. *Id.; Copy–Data Sys., Inc. v. Toshiba America, Inc.*, 663 F.2d 405, 408 (2d Cir.1981).

 Defendants characterize this as a vertical, non-price restraint case, subject to a rule of reason analysis. (Distr.Mem. 10.) Under the rule of reason approach, a court must evaluate "whether the anticompetitive effects of a restraint are outweighed by some procompetitive justification." *United States v. VISA U.S.A., Inc.*, 344 F.3d 229, 238 (2d Cir.2003). It is not sufficient for plaintiffs merely to show that they have suffered injury due to the alleged agreement; they must also demonstrate "an actual adverse effect on competition market-wide." *Elecs. Communications Corp. v. Toshiba*, 129 F.3d at 244. Viewed under this rubric, they argue, plaintiffs' claims fail to demonstrate anticompetitive harm to the market as a whole, rather than mere injury to the Village East. Because "the antitrust laws protect competition, not competitors," *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 57 (2d Cir.1997), they argue that plaintiffs have not demonstrated antitrust injury. (Distr.Mem. 9.)

 Plaintiffs claim that they have alleged sufficient facts to show a "group boycott," which would relieve them from the requirement of demonstrating market-wide anticompetitive effect and subject

them instead to the *per se* analysis. (P. Opp.Br. 19.) "Group boycott" is an agreement to pressure a supplier or customer not to deal with another competitor. *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 294, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985); *Balaklaw,* 14 F.3d at 800. However, not every such agreement is subject to a *per se* analysis: as defendants correctly point out, in the "group boycott" context, the *per se* rule is limited to cases involving horizontal agreements among direct competitors. *NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 135, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998). Plaintiffs argue that their complaint fairly alleges such a horizontal agreement, in that Regal and Loews "have acted in concert, aided by their common management and common ownership through the self-described partnership of Onex and Oaktree, [to] jointly pressur[e] the distributor defendants not to license TCFs to the Village East." (P. Opp.Br. 19.)

▮▮▮▮▮▮ If Onex and Oaktree have in fact conspired to control Loews and Regal jointly, and if they have succeeded in doing so, then Regal and Loews' parallel agreements with distributors may prove to be the products of a horizontal conspiracy. The complaint alleges that Loews and Regal "each entered into unlawful exclusive agreements with the distributor defendants" (Compl.¶¶ 79, 113), that each "pressure[d]" distributors to grant them exclusive clearances (Compl.¶¶ 65, 71,) and that the distributors agreed because they "fear[ed]" retaliation by Loews and Regal. (Compl.¶¶ 7, 71, 77). The problem, as defendants point out, is that the complaint does not explicitly allege that Regal and Loews, Oaktree and Onex, or Kaplan and Karsh for that matter, conspired, contracted, or agreed jointly to require distributors to give them exclusive licenses. (*See* Distr. Reply 2 n. 1.) The closest the plaintiffs come to alleging a horizontal conspiracy with respect to the clearance agreements is its statement that "through their self-described partnership and interlocking directorships, Onex and Oaktree also coordinate between Loews and Regal in various ways." (Compl.¶ 78.) This allegation is simply too vague, and the facts too sparse at this stage in the pleadings, to enjoy a *per se* analysis for purposes of a 12(b)(6) motion.[9]

9. However, plaintiffs have fairly alleged the underlying Sherman Act violations making up the separate components of group boycott, that is, the vertical agreement between exhibitors and distributors and the separate horizontal conspiracy between Onex and Oaktree. *See Valley Disposal, Inc. v. Central Vermont Solid Waste Management Dist.,* 31 F.3d 89, 94–95 (2d Cir.1994) (plaintiff must allege facts which, if proved, would directly or inferentially satisfy each element of a claim). Should evidence produced during the course of discovery indicate that the horizontal conspiracy and the vertical clearance agreements in question were linked, plaintiffs may be able to pursue this theory later in the proceedings.

By contrast, plaintiffs have not sufficiently pled the elements of "circuit dealing," which courts have held unlawful. Circuit deals are agreements whereby exhibitors use their monopoly power (or near monopoly power) in one or more areas to negotiate blanket exclusive agreements with distributors covering all of their theaters, including areas where they may have competition. *See United States v. Griffith,* 334 U.S. 100, 107–09, 68 S.Ct. 941, 92 L.Ed. 1236 (1948), *rev'd on other grounds, Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 771–72, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); *Beech Cinema, Inc. v. Twentieth Century–Fox Film Corp.,* 622 F.2d 1106, 1110 (2d Cir.1980). Plaintiffs raise the allegation of circuit dealing for the first time in their opposition papers, having nowhere alleged in the complaint that defendants negotiated contracts with distributors at a circuit-wide level. (*See* P. Opp. Br. 16–17.) The complaint not only fails to allege facts sufficient to support the allegation of circuit dealing, it also fails to assert even the components of such a theory. It therefore fails to meet the requirement under Fed.R.Civ.P. 8 that plain-

But it is not necessary to resolve whether or not the facts might ultimately support a conclusion of a *per se* violation, because it is clear that the facts alleged could support finding a violation under the rule of reason. Although defendants argue that plaintiffs have failed to allege market-wide harm (Distr.Mem. 11–14), their argument misreads or ignores key aspects of the plaintiffs' complaint. Plaintiffs have made the straightforward claim that distributor defendants have refused, due to pressure from Regal and Loews, to consider plaintiffs' bids to exhibit their top-grossing films. (Compl.¶ 82.) Combined with the coordinated efforts of Onex and Oaktree to control Regal and Loews, this refusal has allegedly resulted in a virtual monopoly for TCFs in lower Manhattan, which has in turn led to lower revenues for Village East, higher box office and concession prices for consumers, reduction in discounts, and restricted output in TCFs.[10] (Compl.¶¶ 25, 90, 91.) Assuming the truth of these allegations, such harms are precisely the type that the antitrust laws were designed to prevent. *See*

*Eastman Kodak Co. v. Image Tech. Servs. Inc.,* 504 U.S. 451, 478, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) ("The alleged conduct – higher service prices and market foreclosure – is facially anticompetitive and exactly the harm that antitrust laws aim to prevent."); *Visa,* 344 F.3d at 241–43 (rules for vendor participation causing reduction in output and consumer choice had anticompetitive effect); *Primetime 24 Joint Venture v. National Broadcasting Co.,* 219 F.3d 92, 103–04 (2d Cir.2000) (refusing to dismiss where complaint alleged agreement resulting in denial of a necessary input to a competitor).

■ Defendants' primary claim, however, is that their actions have fostered rather than restrained competition, and that plaintiffs' injuries are thus not redressable through antitrust law. (Distr.Mem. 3–4.) This theory is borne out, they claim, by the increase in overall revenue and output in the relevant market since defendant Regal's entry. (Distr.Mem. 18.) Plaintiffs' failure to allege a net reduction in competition, defendants claim, should result in a dismissal as a matter of law.[11] (Distr.Mem. 15.) In

---

tiff's claim include "[a] statement of a claim for relief that gives notice to the opposing party." *Todd v. Exxon Corp.,* 275 F.3d 191, 198 (2d Cir.2001). Plaintiffs may not amend their complaint through their opposition brief. *Wright v. Ernst & Young LLP,* 152 F.3d 169, 178 (2d Cir.1998); *Mathias v. Daily News, L.P.,* 152 F.Supp.2d 465, 480 (S.D.N.Y. 2001). Absent the filing of an amended complaint that properly pleads the components of circuit dealing, the Court will not consider this allegation.

10. Defendants further assert that plaintiffs' allegations of higher box office and concession prices and reduced discounts are "overly conclusory [and] devoid even of alleged facts." (Distr.Br. 17). However, at the pleading stage, "a short, plain statement of a claim for relief that gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules." *Todd v. Exxon Corp.,* 275 F.3d at 198. Here, plaintiffs have "identified the co-conspirators and described the nature and

effect of the alleged conspiracy," which is sufficient to withstand a motion to dismiss. *Alco Standard Corp. v. Schmid Bros.,* 647 F.Supp. 4, 6 (S.D.N.Y.1986). To require more would be to hold plaintiffs to a higher pleading standard than is required under the Federal Rules and to thwart congressional intent in providing a private remedy for antitrust violations. *See Nagler,* 248 F.2d at 322–23.

The Court also rejects defendants' argument that plaintiffs lack standing to assert price-increases as a resulting harm to the market because plaintiffs themselves benefit from the price increases. (Exhib. Br. 8 n. 2). It would be nonsensical for the law to insist that plaintiffs allege harm to the entire market and then refuse them standing to bring such allegations.

11. Defendants' argument that overall box-office revenue, the number of screens and the number of movies shown in the Lower Manhattan Zone have increased since Regal's en-

asserting this argument, defendants make two related arguments. First, they point to a line of cases holding that vertical exclusivity agreements between manufacturers and retailers are permissible under antitrust laws. They appear to suggest that because clearance agreements are analogous to such agreements, they should be considered *per se* permissible. (Distr. Mem. 12–14; Distr. Reply Mem. 9.) Alternatively, they claim that under the rule of reason, a court must balance any reduction in competition between dealers in the same "brand" of product, that is *"intra* brand" competition, with the resulting increase in competition between sellers of different products, that is *"inter* brand" competition. *See Elecs. Communications Corp. v. Toshiba*, 129 F.3d at 243–44. They claim that the reduction in potential competition between different theaters showing the same film that results from exclusivity agreements on individual films (*intra* brand competition) necessarily leads to greater competition between competitors showing different films (*inter* brand competition), and that absent a showing of injury to the market, plaintiffs' claims must be dismissed as a matter of law. (Distr.Mem. 11.)

This argument confuses rather than clarifies the relevant inquiry at this stage in the litigation. First, defendants misconstrue the Second Circuit's case law in arguing that clearances are necessarily considered procompetitive. While a few decisions have held that exclusive dealer-retailer agreements are pro-competitive and therefore *per se* legal, *e.g., Elecs. Communications Corp. v. Toshiba*, 129 F.3d at 245, this circuit has also recog-

nized that *any* type of vertical agreement may represent an antitrust violation if it is tainted by other illegalities, as has been alleged here. *See Visa*, 344 F.3d at 242 (vertical agreements illegal where they resulted from horizontal conspiracy). Defendants cite no case in this circuit holding that exclusive clearance arrangements between movie exhibitors and distributors are intrinsically classifiable as retail-distributor arrangements, or that they should be considered *per se* legal. Indeed, such a ruling would be impossible, given the Supreme Court's recognition that clearances may be unlawful where they are "unduly extended as to area or duration." *United States v. Paramount Pictures*, 334 U.S. 131, 145–47, 68 S.Ct. 915, 92 L.Ed. 1260 (1948). It is precisely this claim that plaintiffs raise here: plaintiffs do not attack the practice of granting clearances, but rather claim that the conspiracy they allege has resulted in clearances that are excessive in scope and duration. (Compl.¶¶ 8, 82.) The policy of granting exclusive clearances to Regal and Loews is therefore "simply not one that appears always or almost always to enhance competition, and therefore to warrant a legal presumption without any evidence of its actual economic impact." *Eastman Kodak*, 504 U.S. at 479, 112 S.Ct. 2072.

Second, the "interbrand" versus "intrabrand" analysis is also not entirely applicable to this situation. In *Toshiba*, on which defendants principally rely, a retailer of cellular phones challenged an exclusive agreement with a manufacturer. The court held that there was no Sherman Act violation because the exclusive agreement,

---

try into the market is as irrelevant as it is self-evident. There is no dispute that when Regal entered the market, the number of screens increased and overall box-office revenue climbed in the relevant market. It is not Regal's entry into the market, however, that is the subject of antitrust challenge. Rather,

plaintiffs make the simple "but-for" argument that both their own revenues and consumer choice in TCFs would be higher, and box-office prices lower, if not for the illegal agreements between exhibitors and distributors and the conspiracy between Onex and Oaktree. (P. Opp. Br. 21 n. 7.)

which decreased competition between sellers of the same brand of cell phone, actually increased competition between different brands, and was consistent with the primary purposes of the antitrust laws. Here, it is a contestable question of fact whether the exclusive agreements in question have actually increased competition between different TCFs – especially given the allegation that plaintiffs are denied access to TCFs altogether. *See Quad Cinema Corp. v. Twentieth Century–Fox Film Corp.*, No. 80–5650, 1983 WL 1822, at *8 (S.D.N.Y. May 12, 1983) ("The Loews clearance policy ... could be viewed as foreclosing a significant portion of the first multiple run feature market, thereby restraining the ability of independent exhibitors to enter and compete in the ... market."). While the clearances shutting Village East out of TCFs may force them to seek out less desirable or lower-quality films, thus increasing the overall variety of films shown in the geographic market, it is not apparent that they increase competition within the relevant product market for top commercial films. *See Seven Gables Corp. v. Sterling Recreation Org.*, No. C84–1057R, 1987 WL 56622, at *4–*5 (W.D.Wash. June 25, 1987) (reasonableness of exclusivity agreement between movie distributors and exhibitors was issue of fact). Moreover, it is difficult to see how a blanket refusal by distributors to consider plaintiffs' venue could possibly be considered procompetitive. *Cf. Movie 1 & 2 v. United Artists Communications, Inc.*, 909 F.2d 1245, 1251 (9th Cir.1990) (refusal by distributors to receive bids from independent film exhibitor raised an inference on anticompetitive conduct).

 The essentially factual disputes about what the appropriate "brand" is for purposes of this analysis, or about the ultimate effects of these agreements on competition, cannot be resolved on a motion to dismiss. As the Ninth Circuit has noted, "[d]etermining whether a particular restraint is reasonable requires a thorough investigation of the industry at issue and a balancing of the arrangement's positive and negative effects on competition." *Theee Movies of Tarzana v. Pacific Theatres, Inc.*, 828 F.2d 1395, 1399 (9th Cir. 1987). In addition, the Second Circuit has applied a complex burden-shifting framework to vertical non-price restraint cases that does not lend itself to resolution on a motion to dismiss.[12] *See Capital Imaging Assoc., P.C. v. Mohawk Valley Med. Assoc.*, 996 F.2d 537, 543 (2d Cir.1993) ("Ultimately, it remains for the factfinder to weigh the harms and benefits of the challenged behavior."). Indeed, most of the cases defendants have cited dismissing claims challenging unlawful clearances (Distr.Repl.Mem. 8) have been decided at summary judgment or after trial, upon a finding that the clearances in question did not in fact present an unlawful restraint of trade. *See, e.g., Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1371–72 (3d Cir.1996) (dismissing antitrust claim regarding clearances at summary judgment); *Theee Movies of Tarzana*, 828 F.2d at 1401 (same); *Houser v. Fox Theatres Mgmt. Corp.*, 845 F.2d 1225, 1232–33 (3d Cir.1988) (same); *see also Quad Cinema*, 1983 WL

---

12. Under this framework, a plaintiff must first produce evidence that defendants' actions have had substantial adverse effects on competition; the burden then shifts to the defendant, who must provide a procompetitive justification for their actions; if defendant does so, the burden shifts back to the plaintiff "to prove either that the challenged restraint is not reasonably necessary to achieve the defendants' procompetitive justifications, or that those objectives may be achieved in a manner less restrictive of free competition." *Visa*, 344 F.3d at 238; *see also Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 56 (2d Cir. 1997) (same).

1822, at *1, *8–*9 (denying motion to dismiss because "genuine issues of material fact remain" as to anticompetitive effect of clearances).

It may prove true after discovery or trial that these clearances were in fact competitively justified. However, plaintiffs have plausibly alleged both that the clearances are unreasonable in scope and duration and that they have caused market-wide harm. This is sufficient to survive a motion to dismiss.

### B. Conspiracy between Oaktree and Onex

▆▆▆▆ Defendants challenge plaintiffs' assertion that Onex and Oaktree have conspired to control Regal and Loews on two grounds. First, they contend that plaintiffs have failed to allege facts sufficient to support a finding of conspiracy, and instead, have merely demonstrated the "opportunity to conspire." Because "the mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred," *Maric v. St. Agnes Hosp. Corp.*, 65 F.3d 310, 313 (2d Cir.1995) (internal quotations omitted), they argue that plaintiffs' claim against Onex and Oaktree must be dismissed. (Exhib.Mem. 17–18.) Next, they assert that a conspiracy between Oaktree and Onex to control Regal and Loews "ignores commercial reality and defies common sense." (Oaktree Mem. 5–6; Exhib. Mem. 17.) Oaktree cannot control Regal, they argue, because as plaintiffs have conceded, Oaktree owns only 17% of Regal, while Anschutz, a non-party to this action, owns 77%. This dooms plaintiffs' complaint, in defendants' view, because "general, conclusory allegations need not be credited . . . when they are belied by more specific allegations of the complaint." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir.1995). Each of defendants' arguments fails as a means of dis-

missing plaintiffs' claims at the pleading stage.

Defendants' argument that plaintiffs have failed sufficiently to allege actual conspiracy, rather than mere opportunity, is belied by the facts alleged in the complaint. Plaintiffs have met their burden of pleading a conspiracy by "identif[ying] the co-conspirators and describ[ing] the nature and effect of the alleged conspiracy." *Alco Standard Corp. v. Schmid Bros.*, 647 F.Supp. 4, 6 (S.D.N.Y.1986). They have described the conspiracy as "a conscious plan to acquire control over the market for the exhibition of Top Commercial Films" (Compl.¶ 7), to "coordinate the activities of Regal and Loews in various ways" (Compl.¶ 78), and to squeeze out independent exhibitors (Compl.¶ 77). They have alleged that Kaplan and Karsh share an office and hold seats on the boards of Loews and Regal, respectively (Compl.¶ 78), and that Onex and Oaktree describe themselves in official documents as sharing a "partnership." (Compl.¶ 78). These allegations provide ample factual grounds from which to infer an actual illegal conspiracy to control competitors.

▆▆▆▆ Courts have held that allegations of conspiracy that ignore commercial reality must be dismissed. *See, e.g., DM Research, Inc. v. College of American Pathologists*, 170 F.3d 53, 56 (1st Cir.1999) (section 1 complaint dismissed as "implausible"); *United Magazine Co. v. Murdoch Magazines Distribution, Inc.*, 146 F.Supp.2d 385, 401–02 (S.D.N.Y.2001) (complaint dismissed where predatory pricing scheme deemed "entirely unnecessary"). However, an allegation of conspiracy does not ignore commercial reality simply because it is based on an agreement between parties who lack majority control over one of the entities in question. It is settled law that the lack of numerical control is not dispositive on the existence,

or absence, of anticompetitive harm. *See, e.g., Gulf & Western Indust. Inc. v. Great Atlantic & Pacific Tea Co.,* 476 F.2d 687, 694 (2d Cir.1973) ("As a matter of law, we are not aware of any decision that requires numerical control in order to establish an antitrust violation."). For example, as the Supreme Court has pointed out in a challenge to one party's acquisition of a non-controlling interest in a competitor, "[i]t is not the possibility of control that may prejudice appellants and the public interest, but simply the fact that ... there is likely to be immediate and continuing cooperation between the companies, cooperation which appellants claim will be to their detriment and which ... may be against the public interest." *Denver & Rio Grande Western R.R. v. United States,* 387 U.S. 485, 504, 87 S.Ct. 1754, 18 L.Ed.2d 905 (1967).

It is precisely this type of cooperation that plaintiffs allege here. Plaintiffs contend that Oaktree's 17% interest in Regal and Kaplan's seat on its board of directors give it sufficient control over Regal that it is able to coordinate between competitors Regal and Loews, which it jointly owns with Onex. Such a claim does not lack "common sense" on its face. While the existence of actual "control" over Regal is a question of fact that must be determined after discovery or trial, plaintiffs' assertion that there is a sufficient measure of control to influence the behavior of Regal must be accepted as true for the purposes of a motion to dismiss.[13] Drawing all inferences in plaintiffs' favor, the circumstances alleged in the complaint strongly suggest

anticompetitive behavior. As such, plaintiffs' allegations are neither "general or conclusory" nor are they "belied by more specific allegations in the complaint." *Hirsch,* 72 F.3d at 1092. Defendants' motion to dismiss plaintiffs' section 1 claims must therefore be denied.

## III. *Sherman Act § 2*

 Plaintiffs bring their eighth claim for relief under section 2 of the Sherman Act, which subjects to liability any person "who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. Section 2 was intended to supplement section 1 by specifying that wilful acquisition of monopoly power, a subset of the category of "restraint of trade," is prohibited. *See Standard Oil Co. of New Jersey v. U.S.,* 221 U.S. 1, 61, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.,* 850 F.2d 904, 915 (2d Cir.1988). Plaintiffs contend that Oaktree has attempted to use its power as a shareholder in Loews and Regal and as a holder of board seats in both corporations to coordinate the activities of the two competing entities with the aim of excluding plaintiff from the market, thus creating a monopoly. (Compl.¶¶ 5–7, 15, 24–25, 72–75, 78, 126.)

The Supreme Court has held that a plaintiff claiming relief for attempted mo-

---

**13.** Defendants also assert that plaintiffs have failed to state a claim under section 1 because they have failed to allege that Oaktree or Kaplan and Karsh are "able to control Regal's decisions." (Oaktree Repl. Mem. 8–9.) This argument is frivolous. It is difficult to comprehend why defendants would make lengthy arguments refuting the existence of their control over Regal's decisionmaking if

plaintiffs had failed to allege such control. Plaintiffs have sufficiently alleged actual control through their assertions that Oaktree owns 17% of the voting power in Regal and has a seat on its board, and that Kaplan and Karsh are able to "coordinate" the activities of Regal and Loews. (*See* Compl. ¶¶ 6, 15, 75, 78.)

nopoly under section 2 must make a three-part showing:

> (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market.

*Spectrum Sports Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); *see also AD/SAT v. Associated Press,* 181 F.3d 216, 226 (2d Cir.1999) (per curiam) (same). Defendants argue that plaintiffs have failed to meet these requirements, claiming that because Oaktree is a minority shareholder in Regal, it cannot present a "dangerous probability" of achieving monopoly power in that market. They further contend that Oaktree is not a "competitor" in the market to exhibit TCFs in lower Manhattan, because "a firm cannot monopolize a market in which it does not compete." *Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1062 (2d Cir.1996), *vacated on other grounds by NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998). It is not clear from defendants' arguments whether their main thrust is that Oaktree cannot be liable because it is a minority shareholder, or that as a mere investor, it cannot be liable at all absent piercing the corporate veil. Neither, however, is outcome-determinative, as each is ultimately a question of control.

The analysis overlaps significantly with that under section 1: whether Oaktree may be considered a competitor in the market hinges upon whether it is in fact able to control Regal by virtue of its 17% interest. As discussed above, courts have held that a minority interest may raise antitrust concerns for the purposes of Clayton Act section 7. *See* Part II, *supra.* Similarly, in the context of establishing liability under section 8 of the Clayton Act, a distinguished judge of this Court has held that a plaintiff's "competition with a subsidiary may be properly deemed to a parent corporation where the parent closely controls or dictates the policies of its subsidiary." *Square D Co. v. Schneider SA,* 760 F.Supp. 362, 367–68 (S.D.N.Y. 1991) (Sand, J.); *see also Kennecott Copper Corp. v. Curtiss–Wright Corp.,* 584 F.2d 1195, 1205 (2d Cir.1978) (finding no violation of § 8 of Clayton Act where interlocked parent corporations had competing subsidiaries, but reserving issue whether statute would cover "parent corporation that closely controls and dictates the policies of its subsidiary"); *Crouse–Hinds Co. v. InterNorth, Inc.,* 518 F.Supp. 416, 448 (N.D.N.Y.1980) ("[A] central question [in establishing section 8 liability] is to what extent the parent company controls its subsidiary."). As the Ninth Circuit has noted,

> A parent corporation is not a competitor of another corporation merely because its subsidiary is. On the other hand, to interpret Section 8 as meaning that the business activity of the subsidiary can never be considered in determining whether the parent is a "competitor" within the meaning of Section 8 would assume that Congress intended to permit such a simple and obvious means of avoidance as to render the statute meaningless, and would ignore the Supreme Court's admonition that the antitrust laws are "aimed at substance rather than form." *United States v. Yellow Cab Co.,* 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010(1947).

*U.S. v. Crocker Nat. Corp.,* 656 F.2d 428 (9th Cir.1981) (citations and footnotes omitted), *rev'd on other grounds, Bankamerica Corp. v. United States,* 462 U.S. 122, 103 S.Ct. 2266, 76 L.Ed.2d 456 (1983).

This reasoning holds equal force in determining liability under section 2, as each of these sections of the antitrust laws shares the primary concern of preventing the undue aggregation of market power. *See U.S. v. Aluminum Co. of America*, 148 F.2d 416, 429 (2d Cir.1945).

This Court held in *Brager & Co. v. Leumi Securities Corp.* that the question of control between two corporate entities is an issue of fact:

> whether such entities are in fact mere instrumentalities of a single commercial unit ... or separate units ... will turn upon the independence of action enjoyed by the companies, the extent to which they are mutually owned and controlled, the degree, if any, to which they compete with one another or are held out to do so, and whether any of them were specifically incorporated or controlled to effect anticompetitive purposes. The determination of these factual matters cannot be made upon a motion to dismiss but must await a hearing on the merits.

429 F.Supp. 1341, 1345 (S.D.N.Y.1977); *accord, Square D*, 760 F.Supp. at 367–68 (whether parent corporation exercised control over subsidiary such that competition might be inferred "is a question of fact that precludes granting of the motion to dismiss").[14] If Oaktree in fact stands as the decisionmaking entity behind Regal, calling the shots on its daily decisions and deriving benefit from its activities, then it may be understood as a "competitor in the market." *See Square D*, 760 F.Supp. at 367–68; *Rolite Inc. v. Wheelabrator Environmental Systems, Inc.*, 958 F.Supp. 992, 1000–02 (E.D.Pa.1997) (denying motion to dismiss section 2 claim for failure to allege parent company was a market competitor where parent benefitted from commerce within relevant market).[15] If this is indeed the case, an attempt to bring the competing entities Regal and Loews under common control would clearly pose a dangerous probability of monopolization under section 2. But the threshold question of whether such control exists is a fact-specific inquiry hinging on the particular structure and dynamics of the two entities. Such a determination "must await hearing on the merits." *Brager*, 429 F.Supp. at 1345.

Defendants' final argument under section 2, that plaintiffs have failed to allege anticompetitive or predatory conduct, must similarly fail. Defendants rely once again on the assertion that Oaktree's alleged "coordination" between Regal and Loews is "meaningless" in light of Oaktree's lack of numerical control over Regal. (*See* Oaktree Mem. 11.) This factual question, once again, is not appropriate for the present stage of the proceedings. Plaintiffs have adequately alleged facts supporting an inference that Oaktree attempted to coordinate the competing entities of Regal and Loews with the aim of excluding plaintiff from the market. Defendants' motion

---

**14.** Again, although the question in *Brager* was whether a parent and a subsidiary were liable for conspiring in violation of Sherman Act section 1, its reasoning holds equally true for the purposes of section 2. Whether an entity is considered a competitor should not vary depending upon the section of antitrust law at issue.

**15.** The cases defendants cite for the proposition that a non-competitor may not be held liable under section 2 can be distinguished on grounds that defendants in those cases neither coordinated nor derived benefit from the alleged monopoly, and thus could not be viewed as competitors in the relevant market. *See Discon*, 93 F.3d at 1062; *Spanish Broad. Sys. v. Clear Channel Communications, Inc.*, 242 F.Supp.2d 1350, 1363 (S.D.Fla.2003); *Berlyn v. Gazette Newspapers, Inc.*, 157 F.Supp.2d 609, 620 (D.Md.2001). In any event, none of these cases is binding on this Court.

to dismiss plaintiffs' section 2 claim must therefore be denied.

## IV. Clayton Act § 8

Plaintiffs bring their seventh claim for relief under section 8 of the Clayton Act, 15 U.S.C. § 19. Section 8 provides in relevant part that "[n]o person shall, at the same time, serve as a director or officer in any two corporations ... that are ... competitors such that the elimination of competition by agreement between them would constitute a violation of any of the antitrust laws." [16] *Id.* The purpose of section 8 was "to nip in the bud incipient violations of the antitrust laws by removing the opportunity or temptation to such violations through interlocking directorates." *SCM Corp. v. Fed. Trade Comm'n,* 565 F.2d 807, 811 (2d Cir.1977) (quoting *United States v. Sears, Roebuck & Co.,* 111 F.Supp. 614, 616 (S.D.N.Y.1953)). Plaintiffs claim that Oaktree has engaged in a prohibited board interlock because Oaktree's President, Bruce Karsh, serves on the board of Loews and Oaktree's principal, Stephen Kaplan, serves on the board of Regal. Under plaintiffs' theory, "when a parent company designates different persons to sit on the boards of competing subsidiaries, these persons are treated as 'deputies' of the same principal so that they are the same person for § 8 interlock purposes." *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.,* 828 F.2d 211, 217 (4th Cir.1987).

Oaktree, Kaplan and Karsh contend that this claim must be dismissed. First, they attack plaintiffs' theory as a matter of law, arguing that it is immune from prosecution under section 8. According to defendants, the statute only prohibits "direct" interlocks, in which the same individual serves on the boards of two competing corporations. Moreover, they argue that a corporation cannot violate section 8 because only a natural person can "serve as a director." (Oaktree Mem. 13.) Indeed, defendants assert that section 8 would not cover *any* situation in which one party was "deputized" to serve on a board on behalf of another person – natural or otherwise. (Oral Arg. Tr. 52–56.) Second, they argue that, even if plaintiffs' theory is sound, they have failed sufficiently to plead their theory of deputization. The defendants' arguments fail on both fronts.

### A. Corporate Violations of § 8

Defendants' legal arguments raise two issues: first, whether a corporation is liable under section 8 when its agent serves as director of a competing corporation, and second, the antecedent question of whether section 8 supports a "deputization" theory of liability at all.

Defendants posit that both the language of section 8 and its legislative history indicate that Congress intended section 8 to apply strictly to "direct interlocks," as opposed to "indirect" interlocks, and cite numerous passages in congressional reports and debates that reference violations of section 8 by "individuals." However, these arguments divert attention from the language of the statute, which here, as in all cases, is the starting point for interpretation. *Bankamerica Corp.,* 462 U.S. at 128, 103 S.Ct. 2266. In enacting section 8,

---

16. In order to state a claim under section 8, a plaintiff must also demonstrate that the corporations in question are actual "competitors" within the meaning of the antitrust laws, and that each of the corporations meets a certain threshold for competitive sales, capital, surplus, and undivided profits. 15 U.S.C. § 19(a)(1). It is undisputed that Regal and Loews are competitors in the market, and that each is subject to section 8 under the statutory financial requirements. The sole issue in dispute with respect to plaintiffs' section 8 claims is whether Oaktree can be held liable by virtue of the fact that it has officers who serve on the boards of both Loews and Regal.

Congress did not refer to "individuals" or incorporate any conceptual distinction between "direct" and "indirect" interlocks – nor indeed, did it use the word "interlock" at all. It simply provided that "no person shall, at the same time, serve as a director or officer in any two [competing] corporations." 15 U.S.C. § 19.

At the outset, it must be recognized that the Clayton Act, by its own terms, defines a "person" as including corporations. 15 U.S.C. § 12. There is thus no ground for disputing that corporations are subject to the prohibitions of section 8. This is hardly unusual usage in legal contexts: the notion of corporate personhood has long been a settled convention in our law. *See Clinton v. City of New York*, 524 U.S. 417, 428, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) ("Although in ordinary usage both 'individual' and 'person' often refer to an individual human being ... 'person' often has a broader meaning in the law."). Since a corporation may act only through its human agents, *see Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 101 (2d Cir.2001), the statutory language clearly admits an interpretation broader than that proposed by the defendants.

The defendants propose, however, that a limitation to natural persons is inherent in the phrase "serve as a director." Only human beings, they argue, may serve as corporate directors, and therefore only individuals, and not corporations, can ever be found to violate section 8. This argument assumes, however, that the phrase "serve as director" is equivalent to the phrase "be named as director." To the extent that state incorporation statutes require directors to be individual human beings,[17] only natural persons can be identified as board members.

But this simply raises the question of plaintiffs' "deputization" theory. Plaintiffs hypothesize a scenario something like the following. A powerful director of Corporation A—call him Gepetto—wishes to be a director of competing Corporation B, and is in a position to influence the election of directors. Mindful of section 8, however, he knows that he cannot openly take a seat on Corporation B's board. Instead, he enlists a trusted associate—Pinocchio—and engineers his election as a director of Corporation B. It is expressly agreed that Pinocchio will vote as directed by Gepetto on all matters arising before the board; indeed, we can even imagine that Pinocchio will wear a secret radio device that will permit Gepetto to hear everything that goes on at Corporation B's board meetings, and instantaneously transmit instructions to Pinocchio. In such a situation, plaintiffs ask, can it not be said that Gepetto actually "serves as a director" of both Corporation A and Corporation B, where he sits *de facto* in Pinocchio's seat?

Plaintiffs' interpretation, as a legal theory, makes absolute sense. To hold that Gepetto in this hypothetical has not violated section 8 would be to elevate form over substance; in any meaningful sense, someone who controls a board seat through such an agent or deputy "serves" on the board. Section 8 would be a formalism if it merely prevented the same person from

---

**17.** Indeed, the parties refer to the Delaware code, which provides that "[t]he board of directors of a corporation shall consist of 1 or more members, each of whom shall be a natural person." Del.Code Ann. tit. 8, § 141(b). Both Regal and Loews are Delaware corporations. The parties do not refer to any state that permits a corporation to act as a director of another corporation. It should be noted, however, that there is no conceptual reason why a state that so chose could not allow a corporation to sit as a director of another. Of course, the corporation would have to exercise its responsibilities through an individual agent, and the prohibition of section 8 would prevent a corporation in such a hypothetical jurisdiction from being a director of two competing corporations.

being officially named as a director of competing corporations. Of course, and critically for the instant case, a corporation can "serve as a director" in this *de facto* sense, just as easily as a natural person, even if a corporation may not, as a matter of law, be a named director of another corporation. Indeed, it is precisely in the setting of corporations that the "deputization" theory has it greatest importance. Unlike natural persons, corporations may *only* act through their agents, so the question of deputization arises most naturally in that context.

Defendants make much of the fact that no court has attached liability in an interlocking directorate situation such as this one. But neither has any court squarely rejected such a theory. On the contrary, the few courts that have approached this question have either reserved judgment on factual grounds or adopted a more expansive reading of section 8. In the leading-case, *United States v. Cleveland Trust Co.*, the District Court for the Northern District of Ohio was presented with allegations that the defendant Cleveland Trust, through two different "agents," had been a "member" of the boards of directors of two competing companies. 392 F.Supp. 699, 702 (N.D.Ohio 1974). One of these individuals was the Chair of the defendant's board of directors, and the other was the defendant's Executive Vice President. *Id.* On motion for summary judgment, the court reserved the question of whether "the term 'director' in section 8 may be construed to include corporations, and not merely natural persons." The court concluded that the procedural posture did not allow for granting summary judgment to the government because significant questions remained as to the existence of control by parent corporations of their subsidiaries and of competition between the various subsidiaries. *Id.* Similarly, in *Pocahontas Supreme Coal Co. v. Bethlehem Steel*, the Fourth Circuit stated

on similar facts that "even if the 'deputization' theory be accepted," the theory was not supportable on the record before the District Court, which included only "conclusory allegations" that deputization had occurred. 828 F.2d at 217. It did not, however, reject the deputization theory as a matter of law.

The most relevant Second Circuit authority is *SCM Corp. v. Federal Trade Commission*, in which the Court confronted a "direct interlock" situation where the same individual was accused of serving on the boards of two competing corporations. 565 F.2d 807, 811 (2d Cir.1977). The defendant, one of the corporations in question, argued that section 8 did not allow for injunctive relief against the corporations on whose boards the accused director served, but was limited to enforcement against the individual director alone. Although the court in *SCM* did not specifically address either the issue of whether a corporation may "serve as a director" or whether the statute supports a deputization theory, its reasoning is nonetheless instructive here. In holding that section 8 could be enforced against corporations, Judge Feinberg noted:

> It is true that if the language of the statute is considered alone, the result is not clear. But the language of the section does not stand alone and should not be construed as though it did.... A corporation without fear of sanction could have the concededly prohibited interlocking directorate, and, if detected, simply replace the ousted director with another interlocking board member. Thus, policy supports a broad reading of section 8 and [the statute's enforcement mechanism] indicates that such a construction is reasonable.

*Id.* (quotation omitted). The court held that given the broad preventative purpose of section 8, it made little sense to give the statute an unduly literal reading and ex-

empt corporations from the scope of injunctive relief, as to do so would defeat the purpose of section 8. *Id.* Significantly, the court's emphasis was not on the individual directors, who were treated as fungible, but on the power of the corporation to pull the strings and replace them. The court's holding is grounded upon the existence of an agency relationship between the corporation and the individual who "serves as director."

The case most directly on point is *Square D Co. v. Schneider,* in which Judge Sand adopted the deputization theory, concluding that "a cause of action under § 8 is stated where a company attempts to place on the Board of a competitor individuals who are agents of, and have an employment or business relationship with, such company." 760 F.Supp. 362, 367 (S.D.N.Y. 1991). In *Square D,* the defendant corporation Schneider had attempted to place on Square D's board 11 individuals, all of whom were officers or directors of Schneider's subsidiaries in competition with Square D. The plaintiff in that case argued that "because Schneider is a 'person' within the meaning of § 8 ... the election of the nominees to Square D's Board would violate § 8, in that Schneider would have agents on the Boards of both Square D and its competitors." *Id.* at 366. The court endorsed this theory, concluding that "if [the defendants'] literal reading were adopted, it would be easy for a company to interlock with a competitor and yet evade § 8 liability.... Such a result would exalt form over substance, contrary to the intent of Congress in enacting the antitrust laws." *Id.* Judge Sand thus explicitly accepted both that a corporation may be considered a person for purposes of section 8, and that an interlock based on an agency relationship may violate section 8.

Defendants point out that *Square D* involved the same individuals serving on the boards of two competitors, and that it was therefore a "direct" interlock case. They distinguish these facts from the present case, in which plaintiffs allege that two different individuals, Kaplan and Karsh, serve on the boards of the competing corporations. Defendants contend that the primary concern of section 8 was that "the same *individual* was serving both companies and therefore would hold competitively sensitive information *in his or her own head,* with the risk that he or she may intentionally (or even unintentionally) use it in an anticompetitive way." (D. Reply to Amicus Curiae 6 (emphasis added); *see also* Tr. Oral Arg. 50–51.) But this focus on the subjective knowledge of a unitary individual is misguided, as information can be and is readily shared among individuals. The idea that a single individual serving on two boards could carry in her own head intangible bits of information from directors' meetings that would be impossible to share with a colleague sitting on a second board verges on the silly. A director is privy to documents and reports that can be shared with corporate colleagues, and can easily relay information conveyed orally at board meetings. A "deputized" director presents every bit as much of a danger to competition as a single individual serving on both boards.

Defendants marshal an impressive array of snippets from the legislative history to emphasize that the intent of Congress was to restrict the statute's coverage to individuals. But references in debates or reports to "individuals" serving on multiple boards and distinctions between "direct" and "indirect" interlocks cannot trump the plain meaning of the statute. The House and Senate reports on the 1914 bill do contain language noting that "from an economic point of view, it is not possible that one individual, however capable, acting as a director in fifty corporations, can render as efficient and valuable service in directing the affairs of the several corporations under his control as can fifty capable men

acting as single directors." *Antitrust Legislation*, H.R.Rep. No. 63–627, at 19–20 (2d Sess.1914); S.Rep. No. 63–698, at 16 (2d Sess.1914). Defendants also point to the statement of Representative Nelson in the debates that section 8 was proposed to deal with "the acting of the same men as directors of two or more corporations." 51 Cong. Rec. H–9,169 (1914). But such statements merely indicate that the most obvious type of interlock was foremost in Congress' mind at the time the statute was enacted; the passing references to "individuals" certainly do not indicate Congress' affirmative intent to limit the statute's coverage to individuals or to exempt situations where one individual has been deputized by another.

▮ Indeed, the paucity of explicit discussion of this question in the debates surrounding the bill's passage indicates that it was not the particular form that interlocks might take, but rather their result, that was the primary concern of Congress in 1914.[18] As Congress warned in 1914, "[t]he concentration of wealth, money, and property in the United states under the control and in the hands of a few individuals or great corporations has grown to such an enormous extent that unless checked it will ultimately threaten the perpetuity of our institutions." *See* H. Rep. No. 63–627 at 19; S.Rep. No. 63–698 at 16. It was thus not solely the power of individuals, but of the corporations behind them that motivated Congress: prohibiting interlocking directorates was one means to achieving that goal.

▮ At any rate, the legislative history references compiled by defendants do not squarely address the deputization theory advanced by plaintiffs. There is nothing

---

**18.** Defendants also point to subsequent legislative history, and primarily to two committee reports issued in 1965 and 1990, to demonstrate that later Congresses viewed section 8 as applying only to direct interlocks. *See* Staff of the House Antitrust Subcommittee, 89th Cong., *Staff Report to the Antitrust Subcommittee of the Committee on the Judiciary* (Comm. Print 1965) (section 8 "does not apply where a director of one corporation is a major officer or employee of the other company. Indirect interlocks, similarly, are not covered, notwithstanding the fact that such relationships may dilute competition as much as the direct interlock that is prohibited"); *Interlocking Directorate Act of 1990, Report of the Committee on the Judiciary*, H.R.Rep. No. 101–483 at 4 n. 8 (2d Sess.1990) ("Section 8 only regulates direct interlocks."). Further sections of the record highlighted by defendants fall into two categories: either casual mentions by Congressmembers of the term "individual" when considering amendments to the antitrust laws, or reports given to Congress by third-parties or agencies as to the status of the law. *See, e.g.*, 136 Cong. Rec. 10,425 (1990) (remarks of Rep. Feighan); Federal Trade Commission, Report of the Federal Trade Commission on Interlocking Directorates, H.R. Doc. No. 81–652 at (2d Sess.1950) ("[Section 8] is applicable only to direct interlocks among competitors.... The law does not encompass indirect interlocks, whatever may be their character and significance."); *The Interlocking Directorate Act of 1986: Hearing on s.2163 Before the Senate Committee on the Judiciary*, 99th Cong., 13–23 (1986) (Statement of D. Ginsburg, Assistant Attorney General, Antitrust Div.).

In considering this evidence in the aggregate, the Court heeds the Supreme Court's caution that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). As a result, "subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment." *Id.* at 118 n. 13, 100 S.Ct. 2051. The views of congressional committees or individual members of subsequent Congresses, let alone of subcommittee staff members or of testifying agencies, cannot be taken as indicating the intentions of the enacting Congress fifty or seventy-five years earlier. Still less can such views trump the clear import of the statutory language itself.

"indirect" about the interlock alleged here. Plaintiffs contend that the same "person" (Oaktree, indisputably a person as defined by the Clayton Act) "serve[s] as a director" of both Regal and Loews, through its deputized agents, Kaplan and Karsh. *See Pocahontas,* 828 F.2d at 217. They do not contend that the mere fact that Kaplan and Karsh are employees or directors of Oaktree prohibits their service as individuals on the boards of the competing movie chains. To establish their claim, plaintiffs will have to show not merely that Kaplan and Karsh both work for Oaktree, but that their service on the boards is not in their individual capacities, but as the deputies of Oaktree, acting as the puppets or instrumentalities of the corporation's will, such that it can legitimately be said that it is Oaktree as an entity, and not Kaplan and Karsh as separate persons, which "serve[s] as a director" of both Loews and Regal. Whether such an assertion can be proven must abide the event. But nothing in the legislative history purports to consider and reject the proposition that such a situation violates section 8, and the language adopted by the Congress fits it squarely.

■ Accordingly, section 8 of the Clayton Act prohibits the conduct alleged here. This result comports with both the language of the statute and the broad purpose of Congress in enacting the antitrust laws, *see McCready,* 457 U.S. at 473, 102 S.Ct. 2540, as well as with the doctrine that exceptions to the antitrust laws should be construed narrowly.[19] *See Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 126, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982). To hold otherwise would be to allow corporations (and individuals) to evade antitrust liability simply by designating agents to serve their bidding on the boards of competing businesses. The purpose of the statute, "to avoid the opportunity for the coordination of business decisions by competitors and to prevent the exchange of commercially sensitive information by competitors," *Square D,* 760 F.Supp. at 366, would be ill-served by such a cramped reading.

### B. *Adequacy of § 8 Pleadings*

Finally, defendants raise two issues with respect to the adequacy of plaintiffs' pleading. First, they claim that plaintiffs have

---

**19.** This interpretation is also consistent with the position advanced for over thirty years by both the Federal Trade Commission ("FTC") and the Department of Justice Antitrust Division, the two agencies charged with interpreting and enforcing the statute. (United States Br. Amicus Curiae 9–10); *see also United States v. Cleveland Trust,* 392 F.Supp. 699 (prosecution by government under section 8 based on deputization theory); *United States v. Int'l Ass'n of Machinists and Aerospace Workers,* 1994–2 Trade Cas. (CCH) ¶ 70,813, 1994 WL 728884 (D.D.C. June 14, 1994) (consent decree applying section 8 to prohibit separate agents of a union from sitting simultaneously on the boards of competing airlines); *SCM Corp.,* 565 F.2d at 811 (adopting FTC's interpretation of statute as applying to corporations as well as individuals); U.S. Dept. of Justice, Antitrust Division, Business Review Letter to UAW, Trade Reg. Rep. (CCH) ¶ 50,425 (advising that "the govern-

ment has previously taken the position that a corporation sat on the boards of competing corporations through representatives"). There is no need to decide how much, if any, deference is due to the Government's views. At a minimum, they offer persuasive support for the proposition independently adopted here.

In addition, the leading academic treatise on antitrust law adopts the same view, noting that "[w]here [company] C has a director on the boards of [competitors] A and B, serious anticompetitive consequences could arise if C has an interest in limiting A–B competition." 5 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law 334 (2d ed.2003). The authors proceed to note that "[t]here seems little reason to preclude [section] 8 from embracing the *Cleveland Trust* fact situation, which involved directors who were important bank officers subject to the control and direction of their employer." *Id.* at 335.

failed adequately to allege deputization of Kaplan and Karsh on behalf of Oaktree. (Oaktree Br. 17.) Second, they claim that plaintiffs have failed adequately to allege injury caused by the interlock itself. Neither of these arguments is persuasive. Plaintiffs need not use any particular terms in their pleadings, such as "deputization" or "agency," so long as they have described facts that would allow a court to infer that such a relationship exists. *Cf.* Areeda and Hovenkamp, *supra* at 334 (noting that although "purely 'informal links,' such as good will or personal contacts between the directors of the competing companies and another corporation, would be insufficient" to state a deputization claim under section 8, "proof that [the individuals] were acting on ... behalf [of their employer] would bring the deputization theory into play"). Plaintiffs have alleged that "[Onex and Oaktree's] strategy has been carefully coordinated by Defendants Bruce Karsh and Stephen Kaplan ... two of the most senior executives of Oaktree." (Compl. ¶ 4.) Although proof of the existence of an agency relationship must await discovery, plaintiffs have pled facts sufficient to suggest deputization.

█ Plaintiffs have also adequately pled injury that is causally linked to the section 8 violation.[20] In addition to the allegations of antitrust injury discussed above, plaintiffs have alleged that Kaplan and Karsh "play key roles in orchestrating th[e] coordination [of Loews and Regal]" (Compl. ¶ 6), and that "unless enjoined, Oaktree's interlocking directorates on the Boards of Regal and Loews will continue to eliminate competition between Regal

and Loews and will cause irreparable harm to Plaintiffs and to consumers." (Compl. ¶ 124.) Plaintiffs have sufficiently placed defendants on notice both as to the question of deputization and to the existence of injury traceable to the section 8 violation.

Accordingly, defendants' motion to dismiss plaintiffs' section 8 claim must be denied.

## V. State Law Claims

Invoking the Court's ancillary jurisdiction, plaintiffs bring their ninth and tenth claims under the Donnelly Act, N.Y. Gen. Bus. Law § 340, the New York State antitrust provision, and their eleventh and twelfth claims under state common law for unjust enrichment and tortious interference with prospective contractual relations. Plaintiffs' Donnelly Act claims survive defendants' motion to dismiss, except for the portions stating claims parallel to those brought under section 7 of the Clayton Act. Because plaintiffs have failed to state a claim for unjust enrichment, their eleventh claim for relief must be dismissed; however, the claim for tortious interference with prospective contractual relations states a claim for relief.

### A. State Statutory Claims

█ Defendants' sole defense to plaintiffs' statutory claims is that because New York law interprets the Donnelly Act in light of federal antitrust precedent, *see Great Atl. & Pac. Tea Co. v. Town of East Hampton,* 997 F.Supp. 340, 352 (E.D.N.Y. 1998), plaintiffs' state statutory claims must be dismissed as meritless.[21] Under

---

**20.** Plaintiffs argue that because violations of Section 8 are considered *per se* illegal, they need not allege injury in order to seek injunctive relief, although they would need to do so in order to seek damages. (P. Opp. Br. 67 (citing *Jicarilla Apache Tribe v. Supron Energy Corp.,* 728 F.2d 1555, 1572 (10th Cir.1984) (Seymore, J., concurring in part); *Protecto-*

*seal Co. v. Barancik,* 484 F.2d 585, 589 (7th Cir.1973).)) However, the Court need not reach this issue, as plaintiffs have adequately alleged antitrust injury resulting from the interlock.

**21.** Alternatively, defendants argue that should plaintiffs' federal claims be dismissed, their

New York law, the state and federal antitrust statutes "require identical basic elements of proof." *Altman v. Bayer Corp.*, 125 F.Supp.2d 666, 672 (S.D.N.Y.2000). In light of the holding that plaintiffs have stated a claim under sections 1 and 2 of the Sherman Act, the portions of plaintiffs' ninth and tenth claims for relief under the Donnelly Act relating to those claims must also survive.

 However, the portion of plaintiffs' ninth claim for relief that parallels their claims under section 7 of the Clayton Act is on less firm footing. The complaint states that defendants have "made acquisitions and entered into unreasonable agreements with each other to restrain competition in the exhibition of Top Commercial Films." (Compl.¶ 130.) Plaintiffs thus attempt to use New York law as a back-up for their first through fourth claims for relief, challenging the acquisitions made by Onex, Oaktree, Regal and Loews. The Donnelly Act has been used, though rarely, to prohibit mergers and acquisitions having anticompetitive effect, covered under section 7 of the Clayton Act. *See State of N.Y. v. Kraft General Foods, Inc.*, 926 F.Supp. 321 (S.D.N.Y.1995); *Big Apple Concrete Corp. v. Abrams*, 103 A.D.2d 609, 481 N.Y.S.2d 335 (1st Dept.1984). But because state courts interpret the Donnelly Act in light of federal antitrust law, and because plaintiffs' section 7 claims have

been dismissed, the state claim cannot survive where the federal one has failed.[22] The portion of plaintiffs' ninth claim for relief challenging defendants' acquisitions must therefore be dismissed for the reasons outlined in Part I, *supra*, and defendants' motion to dismiss with respect to this portion of the claim must be granted.

**B. *State Common Law Claims***

 Plaintiffs bring their eleventh claim for relief under a common law theory of unjust enrichment. Their claim is that defendants Regal and Loews "have achieved their market successes by unlawfully leveraging their market power to increase their own revenues at the expense of the Village East ... [thus obtaining] profits to which they were not entitled. A large portion of these profits would have gone to Plaintiffs if not for Regal's and Loews' unlawful conduct." (Compl.¶ 140–141.) Such a claim does not state a cause of action for unjust enrichment under New York State common law. Unjust enrichment is a quasi-contractual remedy. *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 49 F.Supp.2d 298, 301 (S.D.N.Y.1999). No contractual or quasi-contractual relationship is alleged to have existed between plaintiffs and Regal or Loews.

 Plaintiffs recite the elements of unjust enrichment under New York Law and assert that these elements have been met.[23] (P. Opp.Br.70). But plaintiffs' ar-

---

state claims must similarly be dismissed for lack of jurisdiction. However, because plaintiffs' claims under the Sherman Act §§ 1 and 2 and the Clayton Act § 8 survive, ancillary jurisdiction is present over all related state claims.

**22.** The Donnelly Act was modeled on the Sherman Act, not the Clayton Act, and the Court is unaware of any case that has specifically held that such Donnelly Act claims are to be interpreted in light of section 7 of the Clayton Act. However, given that claims for relief have been sustained based on Clayton Act-type violations, there is no reason to de-

part from the general mandate to interpret the New York statute in light of equivalent federal antitrust precedent. *See X.L.O. Concrete Corp. v. Rivergate Corp.*, 83 N.Y.2d 513, 518, 611 N.Y.S.2d 786, 634 N.E.2d 158 (1994); *Great Atl. & Pac. Tea Co.*, 997 F.Supp. at 352.

**23.** The elements are that "(1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience requires defendants to make restitution." *Louros v. Cyr*, 175 F.Supp.2d 497, 514 n. 8 (S.D.N.Y. 2001).

gument would remove the elements of unjust enrichment from the context in which they must be viewed: as an alternative to contract, where a contractual relationship has legally failed. *See, e.g., Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 905 (2d Cir.1997) ("[U]nder the quasi-contractual doctrine of unjust enrichment, courts may infer the existence of an implied contract to prevent one person who has obtained a benefit from another ... from unjustly enriching himself at the other party's expense."). Plaintiffs have not alleged that they had a contractual or quasi-contractual relationship with defendants, and in fact have alleged no prior course of business dealings with defendants whatsoever. *Cf. Redtail Leasing, Inc. v. Bellezza,* No. 95–5191(JFK), 1997 WL 603496, at *8 (S.D.N.Y. Sept.30, 1997) ("[A]n unjust enrichment claim, which is a quasi-contract claim, requires some type of direct dealing or actual, substantive relationship with a defendant."); *In re Motel 6 Sec. Litig.,* Nos. 93–2183(JFK), 93–2866(JFK), 1997 WL 154011, at *7 (S.D.N.Y. Apr.2, 1997) ("The requirements [of unjust enrichment] clearly contemplate that the defendant and the plaintiff must have had some type of direct dealing, an actual relationship or some greater substantive connection than is alleged in this case."). Plaintiffs' unjust enrichment claim must therefore fail.[24]

■■■■ Plaintiffs' twelfth claim for relief is based on the claim of tortious interference with prospective contractual relations. In order to state such a claim, plaintiffs must make a four-part showing: (1) the existence of a business relationship with a third party; (2) defendant's interference with that business relationship; (3) that defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship. *Purgess v. Sharrock,* 33 F.3d 134, 141 (2d Cir.1994). Defendants argue first that plaintiffs failed to demonstrate that defendants used the requisite "improper means," and second, that plaintiffs failed to allege a prospective contract "certain enough" to sustain their claim. (Exhib.Br. 23–24.)

■■■ It seems obvious that alleging violations of federal antitrust law and state statutory law should satisfy the pleading requirements for wrongful conduct. Indeed, the New York Court of Appeals has recognized that a competitor can be held liable for tortious interference with prospective contractual relations where "unlawful restraint of trade is effected." *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 190–91, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980). Moreover, even absent a finding of antitrust violations, certain degrees of economic pressure may be sufficiently wrongful to compel a finding of liability based on this cause of action. *See id.; Technology Consortium v. Digital Communications Associates, Inc.,* 757 F.Supp. 197, 200 (E.D.N.Y.1991). Courts in this Circuit have found violations in situations similar to the one presented here. *See Drug Emporium, Inc. v. Blue Cross of Western New York, Inc.,* 104 F.Supp.2d 184, 192 (W.D.N.Y.2000) (allegations that pharmacies pressured HMO to exclude competitor from network sufficient to withstand mo-

---

**24.** Plaintiffs have also failed to demonstrate that defendants have "received a benefit of money or property belonging to the plaintiff." *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.,* 17 F.Supp.2d 275, 313 (S.D.N.Y.1998). Plaintiff had no entitlement to exhibit the films in question, but rather, was deprived of the opportunity to compete to receive distribution rights to the films. Plaintiffs' unjust enrichment claim that defendants have "received profits to which they were not entitled ... [a] large portion of [which] would have gone to Plaintiffs if not for Regal's and Loews' unlawful conduct" is more appropriately addressed under their next cause of action for tortious interference with contract.

tion to dismiss); *Italian and French Wine Co. v. Negociants U.S.A.*, 842 F.Supp. 693, 701–02 (W.D.N.Y.1993) (wine distributor liable where it threatened to cease distribution of supplier's wine unless supplier breached contract with plaintiff). Plaintiffs have thus alleged wrongful conduct sufficient to sustain this claim.

Finally, defendants assert that plaintiffs have failed to identify with sufficient specificity the prospective contractual relationships in question, claiming that they were required to allege that they "would have received a contract but for defendants' wrongful acts." (Exhib. Br. 24. (quoting *Fine v. Dudley D. Doernberg & Co., Inc.*, 203 A.D.2d 419, 610 N.Y.S.2d 566, 567 (2d Dept.1994))) However, the case plaintiffs cite for this proposition was decided at summary judgment, not on a motion to dismiss. *See id.* Plaintiffs have alleged that Regal and Loews illegally pressured distributors to refuse to license them TCFs, and that they did so knowingly and with the intent to harm plaintiffs. (Compl.¶¶ 144–147.) They have also adequately alleged that "[b]ut for the power of Oaktree, Onex, Regal and Loews over the Distributor Defendants, it clearly would be in the Distributor Defendants' interests to license Top Commercial Films to the Village East." (Compl.¶ 83.) It would be unreasonable to require more specific pleadings prior to discovery. Because plaintiffs have alleged facts, which if true, would satisfy all four elements of wrongful interference with prospective contractual relations, defendants' motion to dismiss plaintiffs' twelfth claim for relief must be denied.

## VI. *Antitrust Standing of Sutton Hill*

■ One final standing issue remains to be resolved. Defendants argue that one of the plaintiffs, Sutton Hill, the "landlord for the Village East property" (Compl.¶ 11), lacks standing to assert claims under any provision of the antitrust

laws. (Distrib.Br. 21–22.) The analysis in Part I above addresses the section 7 claims: it necessarily implies that plaintiff Sutton Hill, like the rest of the plaintiffs, lacks standing to bring those claims. But unlike the rest of the plaintiffs, Sutton Hill's standing deficiencies extend to all twelve claims asserted in the complaint, because Sutton Hill's injuries are too remote to merit antitrust protection.

Under *Associated General Contractors,* courts have held that suppliers to direct market participants "typically cannot seek recovery under the antitrust laws because their injuries are too secondary and indirect to be considered antitrust injuries." *Serfecz v. Jewel Food Stores,* 67 F.3d 591, 597–98 (7th Cir.1995); *see also Rosenberg v. Cleary, Gottlieb, Steen & Hamilton,* 598 F.Supp. 642, 645–46 (S.D.N.Y.1984) (owner of newly constructed supermarket who leased a supermarket to a third party lacked standing under Clayton Act to bring antitrust action). Sutton Hill is not a competitor in the market for top commercial films, but is rather a supplier of facilities for the exhibitor, the direct market participant.

■ Sutton Hill responds that it is not merely a supplier of facilities, but a "holder of a long-term lease on the real property that, by virtue of the landmark protection accorded to its theater architecture and main auditorium rotunda, is essentially limited to a single use: movie exhibition." (P. Opp.Br. 67). Sutton Hill may well have been injured by defendants' alleged actions. But "no matter how real or severe the injury," *Rosenberg,* 598 F.Supp. at 646, plaintiffs do not have standing unless they suffer *antitrust* injury – the type of injury the antitrust laws are designed to prevent. *Brunswick Corp.,* 429 U.S. at 485, 97 S.Ct. 690. "A landlord or receiver of royalties does not establish antitrust standing by showing its receipts are down

and it is in the area where an antitrust violation produced this result." *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.,* 890 F.2d 139, 146 (9th Cir.1989). The injury Sutton Hill has suffered is simply too secondary to merit protection of the antitrust laws.[25] Moreover, allowing it to pursue its claims would raise the concerns of duplicative recovery cautioned against in *Associated General Contractors.* Defendants' motion to dismiss Sutton Hill from the case must therefore be granted.

## CONCLUSION

Defendants' motion to dismiss plaintiffs' suit for failure to state a claim is granted in part and denied in part. Plaintiffs' first through fourth and eleventh claims for relief are dismissed. Plaintiffs' ninth claim for relief is dismissed to the extent that it overlaps with their claims brought under section 7 of the Clayton Act. As to the remainder of plaintiffs' claims, defendants' motion to dismiss is denied. Finally, plaintiff Sutton Hill is dismissed from this action for lack of standing.

SO ORDERED:

**25.** This holding comports with rulings handed down prior to *Associated General Contractors* that landlords of movie theaters did not have standing to raise antitrust claims against motion picture distributors. *See Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292, 1293–94 (2d Cir.1971) (upholding District Court's dismissal of suit brought by landlord of theaters allegedly used by its tenant and various motion picture distributors and exhibitors in furtherance of an antitrust conspiracy); *Harrison v. Paramount Pictures,* 115 F.Supp. 312, 317 (E.D.Pa.1953) (landlord's lowered rental income resulting from alleged agreement between tenant and motion picture producer and distributor was too remote to permit landlord to maintain anti-trust action under Clayton Act).